|                                | |
|--------------------------------|-|
| UNITED STATES DISTRICT COURT   | |
| DISTRICT OF PUERTO RICO        | |

| | |
|---|---|
| ELBA GARCIA-PASTRANA, | |
| Petitioner, | Civil No. 10-2147 (JAF) |
| v. | (Crim. No. 05-354) |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**OPINION AND ORDER**

Petitioner brings this petition under 28 U.S.C. § 2255 for relief from sentencing by a federal court, alleging that the sentence was imposed in violation of her constitutional rights. (Docket No. 1.) The Government opposes (Docket No. 6), and Petitioner replies (Docket No. 7).

**I.**

**Factual and Procedural Summary**

We draw the following narrative from the record of Petitioner's criminal case and appeal (Crim. No. 05-354), Petitioner's motion, the Government's response, and Petitioner's reply. (Docket Nos. 1; 6; 7.)[1] Petitioner was a non-management "regular" employee of the Puerto Rico Aqueducts and Sewer Authority ("AAA"), a public utility. United States v. Garcia-Pastrana, 584 F.3d 351, 358 (1st Cir. 2009). She was a member of the Unión

---

[1] Unless otherwise indicated, all docket numbers refer to the present case, Civil No. 10-2147.

Civil No. 10-2147 (JAF) -2-

Independiente Auténtica de Empleados de la AAA ("the Union"), which represented the interests of AAA's non-management employees, and she also served as the executive secretary for the Central Executive Committee ("CEC") that oversaw Union administration. Id. at 359. Petitioner and the CEC controlled the Union's finances, and they implemented a scheme to embezzle and launder funds designated for the Union's health plan ("the Health Plan"). Id. As a result of the scheme, Petitioner and her ten codefendants illicitly received "more than $ 5.8M from the [Union and health plan accounts] from 1998 through 2004." Id. at 366.

Petitioner and codefendants were charged in a 140-count indictment on October 19, 2005. (Crim. No. 05-354, Docket No. 2.) Petitioner, as the Health Plan's custodian of records, should have produced a missing minute book for the Health Plan's board meetings in response to a subpoena from a grand jury in 2005, but failed to do so, claiming that it had already been seized. Garcia-Pastrana, 584 F.3d at 366. Later, in "early 2006, just months before trial, Garcia gave the minute book to her successor as the Health Plan's executive secretary, . . . [and] later [the book] was obtained by the government during trial. The book contained additional meeting minutes that were not included in the documents seized by the government.[2]" Id. at 367. The government then lent the minute book to "Gerald LaPorte, an expert on ink analysis of documents" for examination, who testified at trial that the minutes "dating from 1995–2003, including all meetings relating to the Health Plan loans, were likely not authored on the dates

---

[2] The book was obtained from the Archdiocese of San Juan; Enrique Dávila, from the Archdiocese, testified at trial that three months previous to trial (some time around May 2006), Petitioner had delivered the minutes book to the Archbishop.

Civil No. 10-2147 (JAF) -3-

presented. He testified that the evidence 'strongly support[ed]' the conclusion that the minutes . . . were all created at the same time, rather than over the course of eight years." Id.

After a twenty-six day trial, a jury found Petitioner guilty of conspiracy to commit mail fraud and embezzlement of labor organization funds in violation of 18 U.S.C. § 371, aiding and abetting embezzlement in connection with healthcare in violation of 18 U.S.C. §§ 2 and 669, and conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), and 1956(h) on June 16, 2006. (Crim. No. 05-354, Docket No. 438.) On December 6, 2006, this court sentenced Petitioner to nine years' imprisonment and a supervised release term of three years; we also imposed a restitution order in the amount of $770,799. (Crim. No. 05-354, Docket No. 686.) The First Circuit upheld the sentence on direct appeal. See Garcia-Pastrana, 584 F.3d 351. Petitioner, with the assistance of the same attorney who served as her appellate counsel, filed the present § 2255 petition with this court on November 24, 2010. (Docket No. 1.)

## II.

## **Standard for Relief Under 28 U.S.C. § 2255**

A federal district court has jurisdiction to entertain a § 2255 petition when the petitioner is in custody under the sentence of a federal court. See 28 U.S.C. § 2255. A federal prisoner may challenge his or her sentence on the ground that, inter alia, it "was imposed in violation of the Constitution or laws of the United States." Id.

The petitioner is entitled to an evidentiary hearing unless the "allegations, even if true, do not entitle him to relief, or . . . the movant's allegations need not be accepted as true

because they state conclusions instead of facts, contradict the record, or are inherently incredible." Owens v. United States, 483 F.3d 48, 57 (1st Cir. 2007) (internal quotation marks omitted) (quoting David v. United States,134 F.3d 470, 477 (1st Cir. 1998)); see also § 2255(b). In general, a petitioner cannot be granted relief on a claim that was not raised at trial or on direct appeal, unless he can demonstrate both cause and actual prejudice for his procedural default. See United States v. Frady, 456 U.S. 152, 167 (1982). Claims of ineffective assistance of counsel, however, are exceptions to this rule. Massaro v. United States, 538 U.S. 500 (2003) (holding that failure to raise ineffective-assistance-of-counsel claim on direct appeal does not bar subsequent § 2255 review).

## III.

## **Analysis**

Petitioner alleges she received ineffective assistance because (1) her trial counsel failed to allow her to testify or inform her of her right to testify (Docket No. 1 at 3); we held an evidentiary hearing on February 7, 2012, to hear additional testimony as to this claim. Petitioner further alleges that (2) her trial counsel also failed to conduct proper investigation and interview potential witnesses, and (3) her appellate counsel was ineffective because of his failure to challenge the amount of restitution imposed. (Id. at 11, 19–20.) We discuss each claim in turn and, for the reasons outlined below, find that Petitioner is not entitled to § 2255 relief.

The Sixth Amendment "right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686 (1984) (internal quotation marks omitted); see U.S. Const. amend. VI. To prevail on a claim of ineffective assistance of counsel,

Civil No. 10-2147 (JAF)                                                                                           -5-

Petitioner must show not only a deficient performance by trial counsel, "but also that the deficient performance prejudiced the defense and deprived the defendant of a fair trial." United States v. Manon, 608 F.3d 126, 131 (1st Cir. 2010) (quoting Strickland, 466 U.S. at 687).

A Petitioner may satisfy the deficient-performance prong by showing that the trial counsel's representation "fell below an objective standard of reasonableness," a standard that is informed by "prevailing professional norms." Peralta v. United States, 597 F.3d 74, 79 (1st Cir. 2010) (quoting Strickland, 466 U.S. at 688). Furthermore, Petitioner faces the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. We focus on the "fundamental fairness of the proceeding" when making an ineffectiveness assessment. Id. at 696. Choices made by counsel that could be considered part of a reasonable trial strategy rarely amount to deficient performance. Id. at 690. A decision by counsel not to pursue "futile tactics" cannot be characterized as deficient performance. Vieux v. Pepe, 184 F.3d 59, 64 (1st Cir. 1999).

"The prejudice factor requires the defendant to 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Manon, 608 F.3d at 131–32. (quoting Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

**A.     Right to Testify**

Petitioner alleges that her trial counsel, Myriam Ramos-Grateroles ("Ramos"), did not permit her to testify, and never advised her of her right to testify. (Docket No. 1 at 3.) "It is

Civil No. 10-2147 (JAF)                                                                                                      -6-

clear that a defendant has a 'fundamental constitutional' right to testify in his own defense, and that the right must be 'unfettered,' . . . . [and] may not be waived by counsel acting alone." Owens, 483 F.3d at 58 (internal citations omitted). The "failure to inform a defendant of his right to testify constitutes performance outside of an objective standard of reasonable competence, and . . . such performance is constitutionally deficient." Id. (citing United States v. Teague, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc)).

This court held an evidentiary hearing on February 7, 2012, to hear testimony regarding whether or not Petitioner's attorney informed her of her right to testify or prevented her from testifying against her wishes. (Docket No. 8.) We heard testimony from Defendant, her "common law husband" Eric Aponte, trial counsel Ramos, and Ana Maria González-Ramos ("Ms. González"). (Docket No. 11.) After hearing the testimony, we accord full credibility to Attorney Ramos and Ms. González, and we deem Petitioner's testimony utterly lacking in credibility based on its implausible content and glaring inconsistencies in addition to her demeanor and delivery on the witness stand. Based on the testimony at the evidentiary hearing of February 7, 2012, the evidence presented by the government at trial, and the potential evidence that could have been admitted to impeach Petitioner had she testified,[3] we find Petitioner's assertions to lack merit.

Ramos testified that she not only informed Petitioner of her right to testify, but also discussed it with her in depth and gave Petitioner the choice of testifying. In the early stages of formulating their trial strategy, Ramos explained that Petitioner planned on taking the stand,

---

[3] We accord no evidentiary value to the portion of the Government's brief summarizing a telephone conversation with Petitioner's trial attorney allegedly held on February 10, 2011. (Docket No. 6 at 6.)

but she got scared as the government began to gather evidence after the missing minute book miraculously appeared in ecclesiastic hands. Ramos testified about a Sunday afternoon visit with Petitioner to the house of Jorge Arroyo, the defense attorney of codefendant Felipe Román-Lozada. Although Ramos' testimony differed from that of Petitioner,[4] all agreed that the reason for the visit was to review potential testimony and trial strategy. Ramos testified that Petitioner was never alone with Mr. Arroyo, and that Ms. González, his spouse, was present in the house but not always in the same room while the trio discussed their defense strategy and rehearsed potential testimony. Ms. González also testified she was present in the house to offer any assistance her husband should require, and she said Petitioner was never alone with her spouse; we deemed this testimony credible. Ramos testified that she informed Petitioner of the potential consequences of taking the stand, including the likelihood of impeachment by the government and its destructive potential for her defense. Ramos testified that after their discussions, Petitioner decided not to testify, which Ramos felt was a better choice for their defense strategy, but she stressed that Petitioner knew that the decision was ultimately her own to make.

By contrast, Petitioner and her life partner testified at the evidentiary hearing that Ramos had prevented her from testifying. She further testified that during her visit with Ramos to the house of Mr. Arroyo (who, at the time, relied upon a wheelchair, an elevator, and his wife's assistance to navigate his home due to late-stage amyotrophic lateral sclerosis), he asked her to

---

[4] The primary difference was that Petitioner claimed that the late Mr. Arroyo (whose wife, Ms. González, assisted in the majority of his daily life activities at the time because he suffered from amyotrophic lateral sclerosis) tried to dissuade her from testifying. Their testimony also differed as to details such as the time of the meeting and whether Petitioner or Ramos drove to the meeting. As discussed above, we accord no credibility to Petitioner's testimony.

step over to his (second-floor) office and, then, while they were alone, he attempted to convince her not to testify at trial. (Evid. Hr'g Tr. 7–9, Feb. 7, 2012.) Petitioner further testified that her desire to testify was unflagging throughout trial, but Ramos prevented her from testifying and never told her that the decision to testify was hers to make. Finally, Petitioner offered examples of potential testimony she could have given at trial. (Id. at 44–59.) Although she offered some humorous interludes for the court during the hearing,[5] we deem her testimony to completely lack credibility and exculpatory potential.

In accordance with Ramos' testimony, we find that Petitioner was aware that if she testified at trial, she could have been severely impeached based on her conduct and relationship to the minutes book that the government's expert had denounced as falsified. As described above in Part I, Petitioner, the Health Plan's custodian of records, produced the doctored minutes book well after the grand jury subpoena. Petitioner testified at the evidentiary hearing as to a variety of proposed testimony that she claims she would have given at trial, echoing the

---

[5] For example, Petitioner claimed that she has used the same Mont Blanc pen for her signature for several years—offering this as an explanation for why the government ink expert somehow determined that the minute book entries were all made at the same time. When confronted at the hearing with the several different varieties of ink and nibs found in the suspect minute book entries, she volunteered inconsistent new facts as to the nature of her Mont Blanc pen set but, after continued questioning, she ultimately sighed and dismissed a follow-up question by replying, "That could be . . . . It's just a signature." (Evid. Hr'g Tr. 53.)

allegations filed along with her memorandum of law[6] but, as discussed above, her self-serving testimony suffered from a notable lack of credibility.

Therefore, Petitioner's invocation of Owens proves inapposite; in that case "one of Owens' trial attorneys provided detailed affidavits indicating that Owens was never told of his right to testify at trial." 483 F.3d at 60. Here, however, Petitioner's trial counsel has provided no such affidavit and actually testified that she did inform Petitioner fully of her choice and right to testify and, thus, Petitioner's claim must fail.[7] Passos-Paternina v. United States, 12 F.Supp. 2d 231, 239–40 (D.P.R. 1998) (quoting Underwood v. Clark, 939 F.2d 473, 475–76 (7th Cir. 1991)) (internal quotation marks omitted) (holding "barebones assertion by a defendant" insufficient and requiring particularity as well as "some substantiation . . . such as an affidavit from the lawyer who allegedly forbade his client to testify"); see also Owens, 483 F.3d at 60 n.9 (internal quotation marks and citations omitted) (explaining that "on habeas review, a [district court] may assess the credibility of the defendant's assertion that he would

---

[6] Petitioner alleged that given the chance, she would have testified as to a myriad of topics, including, inter alia, her explanations of: Her assumption that "compensation to members of the executive committee . . . for work performed for the Health Plan" was "institutionally approved;" her opinion that union president Héctor René Lugo ("Lugo") "was a dictator [who] would destroy anyone that went against him;" that Lugo disliked Petitioner and ordered her not to include Health Plan income in her tax return; that union actions "painted at trial as improper were carried out at the suggestion of the [Insurance Commissioner];" that she did not intend to embezzle; and that the preparation of the minutes book "had nothing to do with an attempt to obstruct justice." (Docket No. 1 at 3–8.)

[7] Even if trial counsel had not informed her of her right to testify, we doubt Petitioner could show that prejudice resulted. Owens involved genuinely exculpatory testimony, but the court noted that in a case where a "defendant would have testified only 'to demonstrate that the prosecution failed to disprove his defense of justification beyond a reasonable doubt,' there is a weaker argument that the defendant was prejudiced by not testifying." 483 F.3d at 59 (quoting Brown v. Artuz, 124 F.3d 73, 80 (2d Cir. 1997)). Even if she had been credible, Petitioner's proposed testimony consists of mere explanations and justifications for her conduct—not claims of non-involvement.

Civil No. 10-2147 (JAF)                                                                                    -10-

have testified in light of the evidence presented at trial and the evidence that could have been admitted if the defendant had testified").

Additionally, a word must be said about attorney Jorge Arroyo, a codefendant's trial counsel, and about his professional reputation until the moment of his unfortunate passing. Jorge Arroyo was a former U.S. Navy Judge Advocate and Assistant U.S. Attorney, and a first-class attorney and distinguished member of the defense bar. In the two decades we dealt with Mr. Arroyo, he was a strict observer of ethical principles and we seriously doubt that Arroyo would embark on a mission to convince a codefendant, not his client, to give away the constitutional right to testify in her own defense. This is a fact known to all legal professionals involved in this case, including Mr. Castro-Lang.

Furthermore, we have over twenty years of experience dealing with—and often disagreeing with—attorney Ramos in the courtroom. We know that she is a top-notch defense attorney who is incredibly devoted to advocacy for her clients. We do not believe that she would engage in the conduct with which she was charged in this case, and our incredulity was confirmed by the utter lack of credible testimony by Petitioner at the hearing.

That said, we pause briefly for a note on civility and professionalism—or the lack thereof—with respect to the behavior of Rafael Castro-Lang, Petitioner's current counsel, during the evidentiary hearing. Mere seconds after Ramos took the stand, he requested permission to treat her as a hostile witness; throughout her examination, he employed a rancorous tone of voice; and during questioning, he continuously attempted to insert leading questions and exculpatory arguments. Moreover, his examination of Ms. González—regarding

Civil No. 10-2147 (JAF) -11-

her household in the late days of the illness of her late husband, who she cared for until he passed—raised more than a few eyebrows in court. An uninformed spectator might have supposed Castro-Lang was grilling a hardened criminal instead of an uninvolved third party called to testify about a relatively minor detail in the case. We note there are alternative ways to attempt to discredit a widow's testimony that do not require raising one's voice and insinuating that she failed in her duties as mother and caretaker. In sum, vigorous advocacy and professional courtesy are not mutually-exclusive concepts, and we remind Castro-Lang—and other defense attorneys—that he could have easily found himself on the witness stand had he been Petitioner's trial counsel instead of Ramos.[8]

### B. Failure to Investigate

Petitioner next claims that trial counsel was ineffective because of the failure to "properly investigate, interview and present witnesses that would have established that she was entitled to be paid for the services she performed" for the Health Plan. (Docket No. 1 at 11.) We disagree. Petitioner argues that if her trial counsel had conducted adequate investigation, she could have illustrated her lack of criminal intent by showing that the "compensation for work performed for the benefit of the Health Plan in addition to labor pay leave had been officially approved [by the Union Board] and was an accepted practice." (Id. at 13.)

We cannot deem the performance of Petitioner's trial counsel deficient. We note that in examining "counsel's performance, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant

---

[8] This hypothetical becomes even more plausible given that Castro-Lang himself alleges his own ineffectiveness on appeal as part of Petitioner's § 2255 motion, see infra Part III.C.

Civil No. 10-2147 (JAF)                                                                                              -12-

must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Pina v. Maloney, 565 F.3d 48, 55 (1st Cir. 2009) (quoting Strickland, 466 U.S. at 689) (internal quotation marks omitted). Moreover, we recognize that "the duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005). We cannot say that failure to investigate and interview witnesses in order to raise such an argument did not constitute a sound trial strategy and, as such, did not constitute deficient performance.

Furthermore, even if the performance had been deficient, Petitioner would have faced no prejudice. Considering the strength of the government's case against her, the effectiveness of Petitioner's defense absent the additional information from investigation, and the value of the additional testimony or information in undermining the government's case, we find that, based on the totality of the evidence before the jury, Petitioner's proposed additional information would have no added value and would have not undermined the government's case. See González-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001) (listing factors to consider in prejudice determination). The government's evidence at trial proved substantial —including the evidence that for several years after 2001, Petitioner regularly received "payments from the Cultural Trips Account. All told, she received $ 209,379 from the account during the period when it contained diverted Health Plan funds. Like the payments she received from the Infrastructure and Union Accounts, she did not report any of the Cultural Trips

Civil No. 10-2147 (JAF) -13-

payments in her tax returns." Garcia-Pastrana, 584 F.3d at 362 n.13. The First Circuit stated that the trial "evidence conclusively contradicts [the] assertion" that Defendants' actions were taken in good faith. Id. at 377. Furthermore, the court also noted that Petitioner's "role in creating the administrative contract itself (and providing the forged minutes to support the contract) provides substantial evidence of her intent." Id. at 378.

Finally, insofar as Petitioner argues that she was actually entitled to receive double compensation, this argument must fail, since she has already raised it. United States v. Michaud, 901 F. 2d 5, 6 (1st Cir. 1990) (citing Tracey v. United States, 739 F. 2d 679, 682 (1st Cir. 1984) (explaining that claims decided on direct appeal "may not be relitigated under a different label on collateral review"). On direct appeal, the First Circuit rejected the argument that Petitioner and her codefendants "were entitled to additional compensation for the work they performed on behalf of the Health Plan, and that this compensation was authorized by the collective bargaining agreement, the constitution, the Plan bylaws, and 'historical practice.'"[9] Garcia-Pastrana, 584 F.3d at 375.

C. **Appellate Counsel's Failure to Challenge Restitution Amount**

Petitioner next argues that her appellate counsel—the very same attorney who prepared her § 2255 petition in the present case—provided ineffective assistance by failing to challenge the monetary amount of the restitution order imposed. Claims of ineffective assistance of

---

[9] Specifically, the First Circuit found that "the Health Plan was subject to Puerto Rico's Insurance Code, and under the Code the Health Plan was required to seek approval from the OIC, and to furnish to the Commissioner the adequate information to justify the delegation of administrative services to the Defendants." The First Circuit determined that the evidence at trial "showed that the Defendants failed to do so in this case and, thus, they cannot resort to their historical practice as a source of authority." Garcia-Pastrana, 584 F.3d at 376 (internal citations and quotation marks omitted).

Civil No. 10-2147 (JAF) -14-

appellate counsel are also measured under the Strickland standard. Smith v. Robbins, 528 U.S. 259, 285 (2000). Appellate counsel need not "raise every non-frivolous claim, but rather selects among them to maximize the likelihood of success on the merits." Lattimore v. Dubois, 311 F.3d 46, 57 (1st Cir. 2002).

Insofar as Petitioner challenges the restitution order itself—apart from her ineffective assistance claim—it must also fail because the First Circuit has held that a criminal defendant, who is in custody, cannot "collaterally challenge the restitution order imposed as a part of his sentence" under § 2255. Smullen v. United States, 94 F.3d 20, 26 (1st Cir. 1996). Petitioner seeks to "reduce or eliminate the restitution amount," (Docket No. 1 at 27) and, thus, her claim fails as § 2255 is not the appropriate vehicle to seek such relief.

## IV.

## **Certificate of Appealability**

In accordance with Rule 11 of the Rules Governing § 2255 Proceedings, whenever we deny § 2255 relief we must concurrently determine whether to issue a certificate of appealability ("COA"). We grant a COA only upon "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this showing, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Miller-El v. Cockrell, 537 U.S. 322, 338 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). We see no way in which a reasonable jurist could find our assessment of Petitioner's constitutional claims debatable or wrong. Petitioner may request a COA directly from the First Circuit, pursuant to Rule of Appellate Procedure 22.

Case 3:10-cv-02147-JAF   Document 161   Filed 03/02/12   Page 15 of 15

Civil No. 10-2147 (JAF)                                                                                            -15-

## V.

## **Conclusion**

For the foregoing reasons, we hereby **DENY** Petitioner's § 2255 motion (Docket No. 1). Pursuant to Rule 4(b) of the Rules Governing § 2255 Proceedings, summary dismissal is in order because it plainly appears from the record that Petitioner is not entitled to § 2255 relief in this court.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, this 2nd day of March, 2012.

                                                                                  s/José Antonio Fusté
                                                                                   JOSE ANTONIO FUSTE
                                                                                   United States District Judge